S.L. Rose, and another, sued Henry Denn, and others, to enjoin defendants from interfering with the use of an easement and way of necessity.
The Circuit Court for Douglas County, Carl E. Wimberly, J., rendered a decree for plaintiffs, and defendants appealed.
The Supreme Court, Rossman, J., affirmed the decree, and held that an implied way of necessity was reserved by the original grantor and grantee of lands over which the road passed.
This is an appeal by the defendants from a decree of the Circuit Court which held that the plaintiffs "are the owners and users of an easement and way of necessity, more particularly described as follows, * * *. The defendants and each of them be and they hereby are perpetually restrained and enjoined from in any manner closing or interfering with the use and travel of said easement and way of necessity by the plaintiffs * * *." The easement and way of necessity sustained by the challenged decree extends across a tract of land which is owned by the defendants-appellants, Henry Denn and Nora Denn, husband and wife. The other defendants-appellants have an interest in the Denns' property, but the interest is immaterial to the issues in this case. Our use of the term "the appellants" will hereafter mean the defendants-appellants, Henry Denn and Nora Denn. All of the lands involved in this suit are situated in Sections 25, 26 and 35, Township 29 South, Range 9 West, Willamette Meridian, and are near Camas Valley in Douglas County. *Page 4 
A glance at the following sketch, which makes no pretense at accuracy, will facilitate an understanding of the facts which we shall presently narrate.
[EDITORS' NOTE: SKETCH IS ELECTRONICALLY NON-TRANSFERRABLE.] *Page 5 
The ownership by the respondents, who are husband and wife, of the Northeast quarter of the Northwest quarter of Section 35, being the 40-acre tract which our sketch shows, is conceded. The respondents were the plaintiffs in the Circuit Court. Likewise conceded is the fact that the appellants own the tracts attributed to them by our sketch. Their lands are:
 "The West half of the Southwest quarter (W 1/2 SW 1/4) and the Southeast quarter of the Southwest quarter (SE 1/4 SW 1/4), Section 25.
 "Lot No. Four (4) and the Southwest quarter of the Southwest quarter (SW 1/4 SW 1/4) Section 26.
 "A strip of land 120 feet wide off the North end of Lot No. Four (4) and a strip of land 120 feet wide off the North end of the Southwest quarter of the Southeast quarter (SW 1/4 S.E. 1/4) Section 25.
 "All that part of the Adam Day Donation Claim No. 44 in Section 26, described as follows, to-wit: Beginning at the Southeast corner of said Section 26, running thence North 40 chains; thence West 56.50 chains to the Northeast corner of Lot No. 4 in said Section 26; thence South 40 chains to the Southwest corner of said Donation Claim No. 44; thence East 56.36 chains to the place of beginning.
 "All of the above land being in Township 29 South of Range 9 West of the Willamette Meridian, and containing in the aggregate 396.82 acres more or less."
From the appellant's brief, we quote the following:
 "It is undisputed that at present a roadway is in existence over and across the appellant's property including the property acquired by Henry J. Denn from Jacob Denn, the ancestor, in 1894 and that this roadway extends in an easterly and northerly direction commencing about 50 feet west of the northeast corner of the respondents' property." *Page 6 
The quoted language mentions a conveyance made by Jacob Denn to Henry J. Denn in 1894. The conveyee, Henry J. Denn, was the son of the conveyor and father of the appellant, Henry Denn. It is the contention of the respondents that since the conveyed tract lay between the public road and other tracts which the conveyor owned, an implication arose that the conveyor reserved an easement or way of necessity across the conveyed lands. The thoroughfare shown on our sketch and marked "public road" is a county road which was opened in 1874. Thus, the easement, recognized by the decree, is not imposed upon the retained land, but upon the conveyed property. The quoted statement speaks of the "present" existence of the road which it mentions, but the appellant, Henry Denn, as a witness, conceded that the road was in use as long ago as 1914. That road is the "easement and way of necessity" claimed by the respondents and mentioned in the part of the decree which we quoted. We made no effort to trace it upon our map. Hereafter when we employ the term, "the road", we will mean the purported "easement and way of necessity"; that is, the road described in the sentence which we just took from the appellants' brief. It will be observed from the statement which we quoted that the road terminates at its western extremity in the respondents' 40-acre tract of land. Its eastern end leads into the county road which shortly, in its southerly course, joins the Coos Bay Highway. The road (easement) is the same one which was the subject matter of Baum v. Denn, decided by us November 15, 1949.
The respondents' tract contains a stand of timber and is unimproved. The appellants' land is improved with a dwelling house and farm structures. *Page 7 
The complaint alleges:
 "That the lands of the plaintiffs and the defendants, as hereinabove described, were derainged by separate chains of title from a common grantor, Jacob Denn, who owned all of said lands on or about the year 1894. That at the time said lands were owned by Jacob Denn there was a county road running along the east boundary of the lands now owned by the defendants and then owned by Jacob Denn, and that said county road has ever since that time and now is used by the general public as a public highway. That there was not at the time the property was conveyed to the plaintiffs' predecessors in interest nor is there now any public road which can be used as ingress to and or egress from the hereinabove described lands of the plaintiffs. That it is necessary that the plaintiffs have ingress to and egress from their lands."
That averment is denied by the answer, but the part concerning deraignment of title from a common source was conceded, as well as established, by evidence at the trial. The complaint alleges that January 10, 1945, the appellants erected a barrier across the road and denied the respondents the privilege of using it any further.
The respondents' brief claims that they obtained their right to the use of the road in the following ways: (1) "By implied right or grant"; (2) "right to travel the same by reason of the way of necessity"; (3) "if, as the appellants contend, there is no implied right, then the respondents and their predecessors have acquired their rights to the same by adverse use, as shown by the testimony of both appellants and respondents as to the many years that the roadway was in use and travel." The appellants present the following contentions: (1) "The record does not show evidence *Page 8 
that the respondents acquired the described easement by prescription"; (2) "the doctrine of implied easement does not apply"; and (3) "the doctrine of a way of necessity does not apply."
Although the parties express their contentions in the words just quoted, the issues to which they devoted their major efforts during the trial were these: (1) Does any public road lead to the tract owned by the respondents? and (2) was it necessary for the respondents to travel upon the appellants' land in order to reach a public thoroughfare? During the trial the respondents contended that no public road reached their property and that the appellants' land lay between respondents' and the public thoroughfare. The appellants controverted those propositions. During the trial they contended that a public road known as the Amstein Camas Valley road touched the respondents' tract and that another known as the Southwick road or the Holmes Creek road was available to them. Further, they contended that the predecessors in interest of the respondents, in going to or from the land now owned by the respondents, did so by passing through an area termed by the appellants "the back pasture."
The answer affirmatively alleges:
 "That a county and public road known as the Amstein Camas Valley Road was laid out, viewed, surveyed, established, and approved by the County Court of Douglas County, Oregon, in 1903, and said road is recorded in the Road Records of Douglas County, volume 6 at p. 393.
 "That above described roadway is a public road and has been used over a period of years by the plaintiffs' predecessors in interest as a means of ingress to and egress from their premises." *Page 9 
The affirmative averments of the answer also say:
 "There is a public road known as the Southwick Road or the Holmes Creek Road and described as following * * *; that said road has been and is now in constant use by the plaintiffs herein and their predecessors in interest, and the general public and adjoining landowners and tenants."
We shall now take notice of the evidence applicable to those contentions.
Jacob Denn, whom we have mentioned, received a deed in 1893 which conveyed to him a thousand acres lying in Sections 25, 26 and 35, and which included all of the land now owned by the parties to this suit. April 9, 1894, he gave to his son, Henry J. Denn, the father of the appellant, Henry Denn, a deed which conveyed to him the Southeast quarter of Section 26. There was no consideration for the deed; the transfer was a gift. The Southwest corner of that quarter touches the Northeast corner of the 40-acre tract now owned by the respondents. When that conveyance was made, the conveyor owned land to the west of the quarter section which he was giving to his son. Neither the retained land nor the conveyed quarter section bordered upon or in any other way touched a public road.
One Zack Murray, a witness for the respondents, who has lived in Camas Valley for more than seventy years, testified:
 "I can remember that there was a road there as long as I can remember."
By "a road" he meant the road in question. Going on, he said:
 "That has been more than seventy years. However, there were gates across that road and it has been changed in a place or two where he lives." *Page 10 
By "he" he meant the appellant, Henry Denn. When this witness first saw the road it ran between the house now occupied by the appellants and a barn. Later, its course was altered so that it turned to the left where it came to the barn lot and no longer passed through it. No other material change in the road was mentioned by any witness. Mr. Murray swore that the road "has been used for better than seventy years."
He also testified:
 "Q. Was the road during this period of time used by different means of travel, by wagon and buggies and automobiles?
 "A. Yes. The road here, of course, at that time, along in even up until the nineties they were on wagons, you know; and, however, they used that for automobiles too, those homesteaders over there; they were most of them homesteaders that used that road through there. I don't know under what arrangements or anything about that, but some of them used pack horses and some used pack sacks on their back and some had automobiles they left at the George Moore place. I don't know who lives on that place now.
 "Q. Mr. Murray, was there any other road that could be used in getting to the back end of the Denn ranch?
"A. At that time?
"Q. At that time.
"A. No, no."
Upon cross-examination, the following occurred:
 "Q. Do you know the actual location of this Rose quarter?
 "A. Oh, yes. He has the Northeast of the Northwest Section 35, Township 20, Range 9.
 "Q. Now, Mr. Murray, did this Denn road go right into and connect with this Rose quarter?
 "A. Why, yes, the road that was traveled then. *Page 11 
There was a man by the name of Doney, he had the Southeast of the Southwest quarter and I think Fred Southwick owns that now of Section 35 and this road crossed right in the forty that Mr. Rose owns and went off and came out at the south side of his forty.
* * *
 "Q. What was the condition of this road you spoke of that went through the Rose property — was it a trail or a road?
 "A. Oh, it was a road; it was just a dirt road like probably most of the roads were at that time."
Mr. Murray's testimony, if true, warrants a belief that long before Jacob Denn gave his son the quarter section, a road had been established across the quarter and was used as a means of access to and egress from land west of the quarter, including the 40-acre tract now owned by the respondents. The part of that road which lay between the county road and the conveyed quarter afforded access to the latter. That part crossed land owned by Jacob Denn.
Mr. A.F.C. Frear, for twenty-six and one-half years, has been county road master of Douglas County. Prior to that he worked under a former road master and at one time was deputy county surveyor. He testified that no public road touches, crosses or affords access to the respondents' property.
Bert Nealy, a witness for the respondents, who has lived for forty years in Camas Valley, has been familiar with the road across the appellants' land during all of those years. We quote from his testimony the following:
 "Q. Has the road been traveled by wagon, horse, automobile and other means of transportation?
"A. Ever since I have been in the valley. *Page 12 
 "Q. Do you know the quarter section of ground in controversy, the property owned by Mr. Rose?
 "A. I have been through there a good many times, across the place.
 "Q. Is there any other road that can be used as a means of ingress and egress from that forty to any county road?
"A. No.
* * *
 "Q. Was that road used by old Jacob Denn in hauling his grain?
"A. Yes.
"Q. In the back end of his property to market?
 "A. I think so. The only road that has been in there that I know of in that time. That was the only way Jacob Denn had of getting back to the property, I think; I don't know how else he could get out."
Anna Nealy, another witness for the respondents, began forty-five years ago a course of residence upon the 40-acre tract immediately to the east of the plaintiffs'. While living there she went in and out upon the road in question. Her means of transportation, as described by her, were "horseback and with wagon once in a while." She made it clear that the road over which she traveled as long ago as forty-five years was the road in question, by saying: "The same road they are using now, only change that went through by Mr. Denn's house and barn." As we have explained, in its earlier stages the road went between the house and the barn. In some previous year, unmentioned by any witness, the course of the road was changed so that it went to the rear of the barn. The witness explained that the county road into which the alleged way of necessity empties at its eastern extremity "has been there years longer than my time." *Page 13 
The foregoing is a brief synopsis of the testimony given by some of the respondents' witnesses. The credibility of none of them was challenged. It will be seen that this evidence indicates that seventy years ago a roadway extended across the appellants' property which had its western end in the 40-acre tract now owned by the respondents and its eastern extremity at a county road.
The appellant, Henry Denn, 42 years of age, was born upon the property which he now owns, but he added, "I lived in town most of the time." Evidently his familiarity with the adjacent property is not intimate, for, upon cross-examination, he protested, "I don't know much about them. I don't pretend to know." He recalled the road in question from the time he was a boy, "just playing marbles." Like the other witnesses, he indicated that the present road follows its original course, with the exception of the change around the barnyard.
In 1940 one Jacob Denn, a cousin of the appellant, Henry Denn, owned the 40-acre tract which the respondents now own. That Jacob Denn was a grandson of the Jacob Denn to whom we have frequently referred, and derived his title from him. In February, 1940, Jacob Denn (the cousin) was negotiating a sale of the forty acres to one Oran C. Standley, and in its course showed Standley the property. It was the appellant, Henry Denn, who took his cousin, as prospective vendor, and Standley to the property. In going there, the party traveled over the road in question. The appellant, as a witness, made no claim that he told Mr. Standley or his cousin that they had no right to travel the road or that the latter could be barricaded at any time. In fact, if he mentioned the road during the trip *Page 14 
he failed to disclose that matter when testifying. Standley received a deed of conveyance February 8, 1940, and four years later conveyed the property to the respondents.
The appellant, Henry Denn, testified that during the time his grandfather owned the forty acres which the respondents now hold, he cut down and removed from it some timber, but swore that the logs were taken out "through the back pasture and around the other road." We find it impossible to gain any clear impression from this witness' testimony as to the whereabouts of the "other road." Efforts were made to elicit from others testimony concerning a road which lay in the back pasture, but their vague statements give no clear impression as to where it lay or how it connected with any existing public road. One witness, in telling about this elusive "other road", indicated that its course entered into Section 23 and "the Barney Carey place." There is no evidence that Jacob Denn owned any property in that section. It is clear that this "other road" was not a public thoroughfare.
Other testimony presented by the appellants indicates that there were gates upon the road; that is, the alleged way of necessity. Still other evidence that came from the same source endeavored to show that there was a road which led from land to the east of the respondents' and which, pursuing a southeasterly course, connected with the county road. Some of the witnesses referred to that road as the Southwick road and others termed it the Holmes Creek road. The major part of it is owned by a concern engaged in the logging industry. If we have gained the correct conception of it, it is scarcely passable at its northwestern extremity. It is clear that it is not a public road and that the respondents have no right to use it. *Page 15 
The appellants offered much evidence in an effort to show that a public road known as the Amstein Camas Valley road exists and that it affords the respondents access to and egress from their property. According to the record, a petition was filed in February, 1903, for the establishment of that road. Later the county surveyor and the viewers who were appointed performed the functions exacted of them by our laws. But, so far as the record shows, nothing further was done. Section 4785, Bellinger and Cotton's Code, which was then in effect, said:
 "* * * and the court being satisfied that such road will be of public utility, the report of the viewers being forwarded thereto, the court shall cause said report, survey, and plat to be recorded, and from thenceforth said road shall be considered a public highway, and the court shall issue an order directing said road to be opened."
So far as we know, that action was never taken and the road was never established. Mr. Frear, whom we have already mentioned, testified that the Amstein Camas Valley road is "only a road on paper, a paper road" and that the county never opened it nor spent a cent upon it. The trial judge took the commendable course of visiting the areas we have mentioned in an effort to gain a clearer conception of the facts. While one of the appellants' witnesses was upon the stand giving testimony which indicated that the Amstein Camas Valley road was open and subject to public use, the trial judge addressed him as follows:
 "You remember you were in there the day that Mr. Green and Mr. Felker and I were there, and Henry, I didn't see any evidence of that Amstein road back in there any place; I couldn't find any evidence of it being used in there or couldn't find the location of it on the ground. It hasn't been *Page 16 
used for many years as far as the Rose property is concerned, has it?"
The witness replied:
 "I presume that it hasn't been used for quite a few years."
We think that the Amstein Camas Valley road never achieved even the status attributed to it by Mr. Frear's expression, "a paper road." Evidently the efforts to establish it were abandoned before the time occurred for the county court to enter the order authorized by § 4785, Bellinger and Cotton's Code.
In March, 1907, Jacob Denn, father of Henry J. Denn, who still owned large tracts east of the quarter section which he conveyed to his son in 1894, deeded to the latter:
 "A strip of land 120 wide off the North side (of) the South East quarter of Southwest of Section Twenty five. Also a strip of land 120 feet wide off the north side of the South West quarter of the Southeast quarter of Section twenty five, Excepting therefrom a strip of land sufficient in width for a wagon road on the South side of said strip of land hereby conveyed * * *.
 "Also a strip of land 120 feet wide off the North side of Lot No Four of Section Twenty five, excepting therefrom a strip of land sufficient in width for a wagon road on the South side of said Lot Four * * *."
In May, 1921, the heirs of the aforementioned Jacob Denn signed a quitclaim deed which conveyed to appellant Henry Denn's father the Northwest quarter of the Southwest quarter of Section 25,
 "save and excepting therefrom a strip of land thirty (30) feet wide across the South end of said Northwest quarter of the Southwest quarter (NW *Page 17 
1/4 of SW 1/4). * * * The Southeast quarter of the Southwest quarter (SE 1/4 of SW 1/4) of Section Twenty-five (25), (Save and excepting therefrom a strip of land 100 feet wide across the North end of said Southeast quarter of the Southwest quarter.)
 "A strip of land described as follows: Beginning at a point 11.99.8 feet North of the one quarter corner, between Sections Twenty-five and twenty-six (25 
26), running thence East parallel with one sixteenth line, 1969 feet; thence North twenty feet; thence west 1969 feet; thence south twenty feet, to the place of beginning and containing ninety-two one hundredths (.92) acres."
The respondents argue that the provisions in those deeds for roadways warrant an inference that when Jacob Denn conveyed additional lands to his son he wished the assurance of written words that he would have access to his remaining lands which lay far west of the county road. They make the same argument concerning the deed executed by the heirs. In any event, the reservations indicate that the owners of land in the vicinity of the respondents got in and out by the contested road.
The deed which Jacob Denn and his wife gave to their son, Henry J. Denn in 1894 said:
 "* * * does hereby covenant to and with the said Henry Denn, his heirs and assigns, that they are the owners in fee simple of said premises, that they are free from all incumbrances, and that they will warrant and defend the same from all lawful claims."
The above is a review of all the evidence which indicates whether or not the property now owned by the respondents has had at any time access to and egress from a public highway except over the road which leads across the appellants' lands. *Page 18 
We believe that the evidence clearly warrants a finding that for about seventy years before this suit was filed a road extended across the land now owned by the appellants. Evidently the road was in use for fifteen years or more before Jacob Denn, the grandfather of appellant Henry Denn, received the conveyance in 1893 of the thousand acres, which included all of the land now owned by the appellants and the respondents. It is that road which the decree of the Circuit Court holds is a way of necessity available to the respondents. We think that the road was clearly defined and that its purpose was obvious in 1894 when Jacob Denn gave his son a deed to the Southeast quarter of Section 26. It will be observed that the son, Henry J. Denn, father of appellant Henry Denn, upon receiving his father's deed, could not reach the quarter section which was given to him without crossing land owned by his father and which the latter retained. The father's retained land lay between the county road and the conveyed quarter section. Likewise, the father had no practical, if any, way of getting to or from his lands which lay west of the conveyed Southeast quarter of Section 26 without crossing the quarter section. Obviously, the route which both father and son were compelled to employ was the road in question. In short, the father crossed his son's land and the son crossed his father's. No one claims that either of them ever endeavored to deny the other use of the road. According to the evidence, a gate, or possibly more than one, was encountered along the road. We think, however, that the purpose of the gates was not to exclude those who were traveling to properties remote from the county road, but to restrain wandering livestock. The presence of the gates, of course, indicates that they were a part of fences which *Page 19 
bordered the road; in fact, some witnesses mentioned the fences. The latter further defined the course of the easement and set it apart from the adjacent fields. Finally, we are satisfied that no effort was made until recently to prevent anyone from using the road who had occasion to go to the respondents' 40-acre tract.
From § 474, Restatement of the law, Property, we take the following:
 "When land in one ownership is divided into separately owned parts by a conveyance, an easement may be created, within the limitations set forth in §§ 475 and 476, in favor of one who has or may have a possessory interest in one part as against one who has or may have a possessory interest in another part by implication from the circumstances under which the conveyance was made alone."
Manifestly, no one probed the mind of Jacob Denn in 1894 when he handed the aforementioned deed to his son, Henry J. Denn, and in that manner discerned his wishes concerning the contested road. But, as we see from the language just quoted, we are justified in analyzing the circumstances of which we have taken notice for the purpose of ascertaining whether the conveyor, by implication, reserved an easement over the conveyed tract.
From § 476, Restatement of the Law, Property, we quote:
 "In determining whether the circumstances under which a conveyance of land is made imply an easement, the following factors are important
 (a) whether the claimant is the conveyor or the conveyee,
(b) the terms of the conveyance,
(c) the consideration given for it, *Page 20 
 (d) whether the claim is made against a simultaneous conveyee,
 (e) the extent of necessity of the easement to the claimant,
 (f) whether reciprocal benefits result to the conveyor and the conveyee,
* * *."
It will be recalled that the deed which Jacob Denn gave to his son in 1894 was a general warranty deed. Although the appellants do not claim that the terms of that instrument preclude the existence of the alleged easement, we believe that it is well to take note of the following comment appended to § 476 of the Restatement, at page 2980:
 "* * * Thus, the fact that a conveyance is in the form of a deed containing or implying a covenant against incumbrances * * * is an item adverse to the claim of the implication of an easement in favor of the conveyor. That a conveyance contains such covenants does not necessarily or, in fact, often rebut an otherwise existing implication. Despite them, other circumstances may justify the implication in favor of the conveyor. * * *"
That statement is followed with the following illustration:
 "A is the owner of two adjoining tracts of land, Blackacre and Whiteacre. Blackacre has access to a highway, while Whiteacre is shut off from highways by Blackacre and the lands of other parties. A conveys Blackacre to B. The language of the conveyance contains a general covenant against incumbrances. Despite this covenant, A is entitled to an easement of way over Blackacre to the highway."
At page 2981, the comment says:
 "* * * If a conveyance is gratuitous the implications are less favorable to the conveyee than is *Page 21 
true if he pays value for it. In a gratuitous conveyance the conveyor may be assumed to intend to convey relatively little more than is indicated by the language of the conveyance. * * * As the fact and the extent, if any, of consideration makes clearer the implication of an easement in favor of a conveyee, the lack of, or the smallness of, consideration is a circumstance favorable to the conveyor when an implication is claimed in his favor."
The comment following § 476 says, at page 2982:
 "In the implication of an easement it is important, as pointed out in Comment c, to consider whether the easement is claimed by the conveyee against the conveyor or by the conveyor against the conveyee. It is also important to consider whether it is claimed against a simultaneous conveyee. Where the claim is thus made, the implication is stronger than where the claim is made against the conveyor himself. It is reasonable to infer that a conveyor who has divided his land among simultaneous conveyees intends that very considerable privileges of use shall exist between them. Commonly, in such cases, the conveyance constitutes a family distribution, and, where this is true, the probability of a desire that existing conveniences shall continue to be operative is greater than the probability that a conveyor would desire them continued as against himself. In such cases, the fact that the conveyance is wholly gratuitous is of relatively little significance."
Going on we find at page 2983:
 "In the greater number of cases, its necessity to the use of land of the claimant is the circumstance that contributes most to the implication of an easement. If no use can be made of land conveyed or retained without the benefit of an easement, it is assumed that the parties intended the easement to be created. This is true not only where *Page 22 
it is claimed by the conveyor but also where it is claimed by the conveyee. It is assumed that the parties could not have intended that the land retained by the conveyor should be useless in his hands, though the assumption may not have too firm a foundation in fact. The inference as to intention which is made is influenced largely by considerations of public policy in favor of land utilization.
* * *
 "If the necessity of an easement is such that without it the land cannot be effectively used, nothing less than explicit language in the conveyance negating the creation of the easement will prevent its implication. If some use may be made, or if an alternative to the easement which might otherwise be implied can be secured, the implication becomes subject to control by other circumstances. Thus, the expense and effort necessary to secure a substitute by the conveyor may not be so disproportionate but that it may be assumed he was intended to suffer it, while like expense to the conveyee may warrant the inference that he was not intended to suffer it. * * *."
We resort again to the comment. This time to page 2985:
 "That the conveyor and the conveyee receive reciprocal benefits from the implication of an easement in favor of each contributes to the implication. The fact that both receive benefits and neither alone suffers from the creation of the easement makes it more probable that they intended its creation. Hence, even in cases where the necessity alone would not have been sufficient to justify the implication of an easement in favor of the conveyor, the fact that the circumstances are sufficient to warrant the implication in favor of the conveyee, and that like benefits would accrue to both the conveyor and the conveyee, may justify the *Page 23 
inference that an easement in favor of each was intended. * * *."
Finally, we take the following from page 2988:
 "* * * Each party to a conveyance is bound not merely to what he intended, but also to what he might reasonably have foreseen the other party to the conveyance expected. Parties to a conveyance may, therefore, be assumed to intend the continuance of uses known to them which are in a considerable degree necessary to the continued usefulness of the land. Also they will be assumed to know and to contemplate the continuance of reasonably necessary uses which have so altered the premises as to make them apparent upon reasonably prudent investigation. The degree of necessity required to imply an easement in favor of the conveyor is greater than that required in the case of the conveyee (see Comment c). Yet, even in the case of the conveyor, the implication from necessity will be aided by a previous use made apparent by the physical adaptation of the premises to it. Illustration:
 "A is the owner of two adjacent tracts of land, Blackacre and Whiteacre. Blackacre has on it a dwelling house. Whiteacre is unimproved. Drainage from the house to a public sewer is across Whiteacre. This fact is unknown to A who purchased the two tracts with the house already built. By reasonable effort, A might discover the manner of drainage and the location of the drain. A sells Blackacre to B who has been informed as to the manner of drainage and the location of the drain and assumes that A is aware of it. There is created by implication an easement of drainage in favor of B across Whiteacre."
Most of the above principles governing the implication of an easement by way of necessity have received recognition by this court. Some of our holdings are: Ford v. White, 179 Or. 490,172 P.2d 822; Penn Mutual *Page 24 Life Ins. Co. v. Nelson, 170 Or. 248, 132 P.2d 979; Dean v.Colt, 151 Or. 331, 49 P.2d 362; Beck v. Lane County, 141 Or. 580, 18 P.2d 594; Fendall v. Miller, 99 Or. 610, 196 P. 381;Tucker v. Nuding, 92 Or. 319, 180 P. 903; Brown v. Kemp,46 Or. 517, 81 P. 236.
A well-reasoned decision by the Pennsylvania court, which the respondents called to our attention, is Liquid Carbonic Co. v.Wallace, 219 Penn. State 457. For a good short discussion, see 19 Or. Law Rev. 362. Nothing said in Malsch v. Waggoner,62 Wn. 470, 114 P. 446, which has been submitted to us, detracts in any way from the rules interpreting the effect of evidence submitted for the establishment of an implied way of necessity. That decision says:
 "Appellants further contend * * *; that their south lands, as they express it, are land-locked, and that they have no other practicable means of ingress or egress. These contentions are not supported by the evidence. * * *
* * *
 "There was, however, no necessity for the implied easement for which appellants contend. The evidence disclosed that * * * there is another possible and practicable way from the south lands to the county road entirely within tract C."
Those appellants were the owners of tract C.
We deem it unnecessary to discuss the controlling principles of law any further. They are well set forth in the material we quoted from the Restatement. Most of the language which we took from the Restatement is not law, but common-sense reasoning. It appeals to us as sound and practical. It shows a superior method of determining whether or not an inference is warranted that an easement, of necessity, was impliedly granted or reserved. *Page 25 
There remains for expression only our application of those principles to the facts before us. When Jacob Denn, in 1894, made his son, Henry J. Denn, a gift of the Southeast quarter of Section 26, he still owned large tracts of land west and east of the conveyed quarter section. Unless he employed the road in question, he could not reach his lands west of the conveyed quarter section except by pursuing a circuitous course through an undefined area which some of the witnesses termed "the back pasture." That route seemingly involved passage over the property of others. We know of nothing in the record which shows that any appreciable use was ever made of the back pasture route. We are satisfied that Jacob Denn never used it as a means of reaching the county road. The equivocal references to that route made by a couple of witnesses certainly cannot justify a holding that it constituted a practical means of reaching the property now owned by the respondents. The road in question was, we think, indispensable to both conveyor and conveyee. It was of reciprocal value to each. It afforded the father the means of reaching the lands to the west of the conveyed quarter section, and enabled the son to go from his newly-acquired tract eastward across his father's land to the public thoroughfare. When the father, in 1894, gave his son the deed, the road was well defined upon the ground and obvious to both conveyor and conveyee. It would be absurd to believe that the father who gave the deed as a gift, possibly in the nature of a family distribution, intended that the easement, of great value to him, should be blotted out. In view of all the circumstances and the fact that the conveyee paid nothing for the conveyance, we do not believe that the language of the deed, which is quoted in a preceding paragraph, forecloses *Page 26 
the alleged implied easement. We think that it is clear that both grantor and grantee intended to reserve, across the conveyed quarter section, a way of necessity, and that a similar easement was reserved in subsequent conveyances. In short, we believe that the alleged way of necessity exists, and that the decree of the Circuit Court is correct. That decree is affirmed.